IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

ROBERT C. CARPENTER,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of the Social Security
Administration,

       Defendant.

No. C09-2061

RULING ON JUDICIAL REVIEW

_____

**TABLE OF CONTENTS**

*I.*  *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*  *PROCEDURAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*  *PRINCIPLES OF REVIEW.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*IV.*  *FACTS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.*  *Carpenter's Education and Employment Background.* . . . . . . . . . . . 5
    *B.*  *Administrative Hearing Testimony.* . . . . . . . . . . . . . . . . . . . . 5
        *1.*  *Carpenter's Testimony.* . . . . . . . . . . . . . . . . . . . . . . . . 5
        *2.*  *Shelly Chapman's Testimony.* . . . . . . . . . . . . . . . . . . . . 6
        *3.*  *Vocational Expert's Testimony.* . . . . . . . . . . . . . . . . . . . 7
    *C.*  *Carpenter's Medical History.* . . . . . . . . . . . . . . . . . . . . . . . . 8

*V.*  *CONCLUSIONS OF LAW.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    *A.*  *ALJ's Disability Determination.* . . . . . . . . . . . . . . . . . . . . . . . 15
    *B.*  *Objections Raised By Claimant.* . . . . . . . . . . . . . . . . . . . . . . . 17
        *1.*  *Alcohol Abuse.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        *2.*  *Dr. Myrom's Opinions.* . . . . . . . . . . . . . . . . . . . . . . . . 21
    *C.*  *Reversal or Remand.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*VI.*  *CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*VII.*  *ORDER.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Robert C. Carpenter on December 7, 2009, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Carpenter asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Carpenter requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On July 24, 2006, Carpenter applied for both disability insurance benefits and SSI benefits.[1] In his applications, Carpenter alleged an inability to work since May 4, 2004 due to psychosis, delusions, emphysema, asthma, seizures, back problems, prostate problems, and alcoholism. Carpenter's applications were denied on October 18, 2006. On March 14, 2007, Carpenter's applications were denied on reconsideration. On March 30, 2007, Carpenter requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 8, 2008, Carpenter appeared via video conference with his attorney before ALJ Debra Bice for an administrative hearing. Carpenter, Carpenter's cousin, Shelly Chapman, and vocational expert Vanessa May testified at the hearing. In a decision dated March 26, 2009, the ALJ denied Carpenter's claims. The ALJ determined that Carpenter was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing other work that exists

---

[1] According to the record, Carpenter filed an application for disability insurance benefits on June 28, 2004. *See* Administrative Record at 135-38. The record contains no further information regarding this application. On February 28, 2006, Carpenter filed applications for both disability insurance benefits and SSI benefits. *See* Administrative Record at 139-49. On April 25, 2006, both applications were denied. Apparently, Carpenter did not request reconsideration of these applications, and instead, filed new applications for disability insurance benefits and SSI in July 2006.

in significant numbers in the national economy. Carpenter appealed the ALJ's decision. On October 6, 2009, the Appeals Council denied Carpenter's request for review. Consequently, the ALJ's March 26, 2009 decision was adopted as the Commissioner's final decision.

On December 12, 2009, Carpenter filed this action for judicial review. The Commissioner filed an Answer on February 8, 2010. On March 9, 2010, Carpenter filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he could perform other work that exists in significant numbers in the national economy. On May 10, 2010, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On May 19, 2010, Carpenter filed a Reply Brief. On January 21, 2010, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision 'if the ALJ's findings are supported by substantial evidence on the record as a whole[.]'" *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is

"substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)); *see also Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.' *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 848 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir.

1995)); *see also Moore*, 572 F.3d at 522 ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005)."); *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) ("As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.").

## IV. FACTS

### A. Carpenter's Education and Employment Background

Robert C. Carpenter was born in 1955. He completed the eighth grade. He never obtained a GED. At the hearing, Carpenter testified that he was a "slow learner" and didn't take any special education courses while in school. He also testified that he is able to read, write, and perform simple math.

The record contains a detailed earnings report for Carpenter. The report covers Carpenter's employment history from 1980 to 2008. According to the report, Carpenter had no earnings in 1982, 1983, 2005, and 2008. In the years where he did have earnings, those earnings ranged from a low of $207.06 (1992) to a high of $14,971.07 (1997).

### B. Administrative Hearing Testimony

#### 1. Carpenter's Testimony

At the time of the administrative hearing, Carpenter testified that he had recently started working as a garbage collector in Manchester, Iowa. He worked three days per week for about six hours at a time. According to Carpenter, he needed help from a co-worker to pick up any garbage bags weighing over 50 pounds.

The ALJ questioned Carpenter regarding any medical issues which made it difficult for him to perform full-time work. Carpenter testified that his asthma made it difficult for him to walk more than short distances. He also described back problems which caused limiting pain, particularly when bending or moving a wrong way.

5

Next, the ALJ questioned Carpenter regarding his physical limitations:

Q:      About how long do you think you could be on your feet standing or walking?

A:      Well, like I said earlier, I can walk about a block and then I have to stop and rest. Okay? Standing on my feet, probably 20 minutes to a half hour.

Q:      And then what happens?

A:      Then my legs get tired. My -- and then I have to sit down.

Q:      Do you have any problems when you're sitting?

A:      Somewhat.

Q:      What type of problems?

A:      It depends on which position I'm in.

Q:      How long --

A:      Well, I get pain through my hip areas.

Q:      How long could you sit before you get that pain in your hip area?

A:      Maybe a half hour, hour . . .

Q:      Can you lift . . . something up to, say, 50 pounds, maybe 20 pounds, 25 pounds?

A:      Yes.

(Administrative Record at 45-46.)

### 2.    *Shelly Chapman's Testimony*

Shelly Chapman is Carpenter's cousin. She sees Carpenter on a regular basis each week. Carpenter's attorney asked Chapman about Carpenter's commitment to a assisted living facility for mental health issues:[2]

Q:      Did -- what observations did you have, Shelly, of [Carpenter] that -- prior to him going into Prairie View

---

[2] In June 2006, Carpenter's relatives, in state court, applied for an Order of Involuntary Hospitalization for Carpenter due to delusional thinking and his desire to harm his father. *See* Administrative Record at 361. On June 27, 2006, the Iowa District Court for Delaware County entered an Order committing Carpenter to inpatient treatment at Mercy Hospital in Cedar Rapids, Iowa, and then placement at Prairie View, an assisted living care facility in Fayette, Iowa. *See Id.* at 353-54. Carpenter was admitted to Prairie View on July 3, 2006. *See Id.* at 571. Carpenter remained at Prairie View until March 2008. *See Id.* at 33.

that was the reason the family decided he needed to be institutionalized for his mental health?

A:     He was hallucinating. He was thinking people were after him when they wasn't after him. He was saying crazy things like about his dad, wanting to hurt his dad and stealing and drinking and you name it, he was doing it.

Q:     Okay. And he was at Prairie View under court order and that's an assisted living facility. Correct? And they monitored his behavior?

A:     Yes.

Q:     Okay. Since he's been out, have you noticed any problem with paranoia or hallucinations or anything like that?

A:     No. . . .

Q:     Is he exhibiting any of the symptoms he had before he went into Prairie View?

A:     Yes.

Q:     And what kind of things is he exhibiting now that cause concern?

A:     Well, he is very moody. He -- you never know how he's going to react to other ones.

Q:     And one of the issues with [Carpenter] seems that he doesn't seem to understand the extent of his mental problems. Is that true?

A:     Very true.

Q:     Okay. So he -- even when he went into Prairie View, he didn't think anything was wrong with him?

A:     True.

Q:     Okay. And now you think that he's still having some difficulty, but he may not have very good insight to that?

A:     True.

(Administrative Record at 54-56.)

### 3.    *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is able to perform:

light work. [The individual] must avoid cold or hot or humid environments and avoid exposure to concentrated amounts of dust, fumes or other pulmonary irritants. In addition, [the individual] is limited to unskilled work of a repetitive, routine nature with occasional or less changes in the work routine, no contact with the public and only occasional superficial contact with co-workers.

(Administrative Record at 59.) The vocational expert testified that under such limitations, Carpenter could perform his past work as a sorter and a dishwasher. The vocational expert further testified that Carpenter could perform the following work: (1) courier (900 positions in Iowa and 80,000 positions in the nation), (2) photocopy machine operator (300 positions in Iowa and 32,000 positions in the nation), and (3) laundry folder (800 positions in Iowa and 95,000 positions in the nation).

## C. Carpenter's Medical History

On March 17, 2005, Carpenter met with Dr. Murali Ramaswamy, M.D., for a second opinion on management of dyspnea. Carpenter informed Dr. Ramaswamy that he suffered from asthma all his life, and in 1990, was diagnosed with emphysema. According to Carpenter, beginning in 2003, his dyspnea started to get worse with exertion. Carpenter reported that he could no longer work comfortably at his job. Dr. Ramaswamy noted that Carpenter's effort tolerance was:

limited to 13 steps on a flight of stairs and to walking 100 feet on a level ground. He is also unable to shovel. However, he is not dyspneic for changing clothes, taking a shower, or while eating.

(Administrative Record a t 464.) Dr. Ramaswamy diagnosed Carpenter with moderately severe COPD (chronic obstructive pulmonary disease). Dr. Ramaswamy recommended that Carpenter quit smoking and prescribed medication as treatment.

On April 15, 2005, Carpenter was taken to the emergency room at Regional Medical Center in Manchester, Iowa, for intoxication and severe dyspnea. Dr. Todd

Lawrence, M.D., also noted that Carpenter's family reported mental health concerns for Carpenter. Specifically, Dr. Lawrence noted that:

> Apparently, [Carpenter] has been very paranoid. He keeps hearing helicopters flying over the house which they aren't, thinking that people are coming to get him from St. Louis. He is paranoid when the phone rings and [Carpenter's family members] have found him walking around in the middle of the night in his underwear, very terrified of things going on. They don't think he is sleeping very well. . . . [Carpenter] has never been diagnosed with a psychiatric problem, but [his family members] are quite concerned and they have even brought this up with him that he needs to see a psychiatrist for all of his paranoia and hearing voices and the helicopters. [Carpenter] denies any significant problems and says that he won't take his asthma medication because the doctors are out to get him.

(Administrative Record at 391.) Dr. Lawrence diagnosed Carpenter with severe asthma which was resolved with two nebulizer treatments and medication. Dr. Lawrence also placed a 48-hour hold on Carpenter and transferred him to Mercy Medical Center in Cedar Rapids, Iowa, for a psychiatric evaluation.[3]

On April 25, 2005, Carpenter met with Dr. Joseph J. Chen, M.D., for evaluation of chronic back pain. Carpenter informed Dr. Chen that his chronic back pain dates back 25 years to a farm accident. Carpenter further reported that his back pain is typically worse with activity and better with rest. Upon examination, Dr. Chen diagnosed Carpenter with chronic mechanical and myofascial low back pain. Dr. Chen recommended physical therapy and home exercise as treatment.

On May 3, 2005, Carpenter visited Backbone Area Counseling Center in Manchester, for a clinical evaluation. Carpenter was evaluated by Tim Griem ("Griem"),

---

[3] The record does not contain any information regarding Carpenter's transfer to Mercy Medical Center, or results of any psychiatric evaluation performed at Mercy Medical Center.

MSW, LISW. Griem noted that Carpenter considered himself an alcoholic and started drinking at age 14. Griem outlined Carpenter's mental health issues as follows:

> Problems center around [Carpenter] experiencing some extent of referential delusion as far as viewing that his name keeps being broadcast across the police scanner. Problems center around him having some longevity to depression which appears recurrent in nature and is having some extent of anxiety as well. . . . [Carpenter] has ability in he seems to do better at times he minimize [*sic*] his alcohol use.

(Administrative Record at 406.) Upon examination, Griem diagnosed Carpenter with major depressive disorder, social anxiety disorder, past history of alcohol abuse, and possible schizoaffective disorder. Griem recommended that Carpenter engage in bi-weekly individual outpatient therapy, and be evaluated by a psychiatrist.

On August 2, 2005, Carpenter underwent a psychiatric evaluation performed by Dr. Afshin Shirani, M.D. Dr. Shirani noted that Carpenter's: (1) mood was mostly neutral; (2) his sleep, appetite, and concentration were within normal limits; (3) his energy was somewhat low due to asthma and shortness of breath; and (4) his concentration was not very good because he had trouble recalling both recent and remote events. Upon examination, Dr. Shirani diagnosed Carpenter with alcohol dependence and cognitive disorder. Dr. Shirani concluded that:

> [In the s]hort term, the patient does not report enough symptoms to justify a medication trial for irritability or depression. He is essentially an alcoholic in early remission. He has significant memory problems, probably related to alcohol consumption, aggravated by a history of traumatic brain injury and/or seizures. He might have had a low IQ to begin with. . . . I strongly advised him to stay sober. I recommended that the he should return to see me if significant mood problems or anxiety develop. In the meantime, he should continue counseling as necessary.

(Administrative Record at 417.)

On January 16, 2006, Carpenter met with Dr. George M. Harper, Ed.D., for an intellectual assessment. In making his assessment, Dr. Harper reviewed Carpenter's mental health records and administered several tests measuring adaptive behavior, intellectual ability, and memory. Dr. Harper found that Carpenter functioned with mental abilities approximately two standard deviations below average. Dr. Harper further found that Carpenter's memory abilities were commensurate with his overall intellectual abilities. Dr. Harper determined that Carpenter's "strong score on Matrix Reasoning suggests that this man's visual-spatial reasoning skills are relatively good when he does not need to coordinate these abilities with fine-motor movements."[4] Dr. Harper also determined that Carpenter has "great" difficulty adapting in most ways across a variety of settings. Dr. Harper concluded that with Carpenter's "low intellectual abilities, his very low adaptive functioning, and a reasonable probability that his intellectual functioning was significantly sub-average prior to the age of 18, [he] is eligible for a diagnosis of mild mental retardation."[5] Dr. Harper also noted concern over his observations of paranoid and delusional thinking on the part of Carpenter during the assessment. Dr. Harper opined that "it is certainly possible that [Carpenter] functions with some form of psychosis that is also interfering with his attention span and short-term memory functioning."[6] Dr. Harper diagnosed Carpenter with schizoaffective disorder, major depressive disorder, social anxiety disorder, alcohol abuse, mild mental retardation, and paranoid schizotypal personality traits.

On April 11, 2006, Dr. David A. Christiansen, Ph.D., reviewed Carpenter's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment

---

[4] *See* Administrative Record at 400.

[5] *See* Administrative Record at 400-01.

[6] *Id.* at 401.

for Carpenter. Dr. Christiansen diagnosed Carpenter with cognitive disorder, memory impairment, schizoaffective disorder, paranoid and schizotypal personality traits, and alcohol dependence in reported early remission. Dr. Christiansen determined that Carpenter had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Christiansen determined that Carpenter was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Christiansen concluded that:

> [Carpenter] has moderate cognitive limitations, which would limit his ability to understand and carry out complex instructions as well as maintain focus on the job. Unusual thinking would cause moderate impairment in his ability to interact with the general public and with other[s] at work. He has had no significant period of deterioration and retains the ability to care for himself. The credibility of the allegations is softened by [Carpenter's] use of alcohol and his unusual and variable self-presentation.

(Administrative Record at 475.)

On April 17, 2006, Dr. Richard H. Hornberger, M.D., reviewed Carpenter's medical records and provided DDS with a physical RFC assessment. Dr. Hornberger determined that Carpenter could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about

six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Hornberger also determined that Carpenter should avoid exposure to extreme cold and fumes, odors, dusts, gases, and poor ventilation. Dr. Hornberger found no postural, manipulative, visual, or communicative limitations. Dr. Hornberger concluded that:

> The total body of medical evidence indicates [Carpenter] is capable of performing a full range of light work activities with some environmental limitations. . . . There has been no 12-month period of total impairment.

(Administrative Record at 497.)

On September 22, 2006, Dr. James D. Wilson, M.D., reviewed Carpenter's medical records and provided DDS with a physical RFC assessment. Dr. Wilson determined that Carpenter could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Wilson also determined that Carpenter could only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. Dr. Wilson indicated that Carpenter should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Wilson found no manipulative, visual, or communicative limitations.

On October 18, 2006, Dr. Dee Wright, Ph.D., reviewed Carpenter's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Carpenter. On the Psychiatric Review Technique assessment, Dr. Wright diagnosed Carpenter with cognitive disorder, schizoaffective disorder, schizotypal and paranoid personality traits, and alcohol dependence disorder in remission. Dr. Wright determined that Carpenter had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Wright also opined that Carpenter would have one or two episodes of decompensation for an extended period. On

the mental RFC assessment, Dr. Wright determined that Carpenter was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Wright concluded that:

> The preponderance of the evidence in file would support cognitive limitations of function is [sic] [Carpenter's] case. [Carpenter] would have difficulty consistently performing very complex cognitive activity that demanded prolonged attention to minute, complex details and rapid shifts in alternating attention. Despite these limitations, [Carpenter] can sustain sufficient concentration and attention to perform a range of noncomplex, repetitive, and routine cognitive activities when it is in his perceived interest to do so.

> [Carpenter] is not currently exhibiting serious limitations of function socially. However, he does have a history of difficulties receiving feedback from others and can be distracting to others when his psychiatric status is unstable and he is abusing alcohol. Currently, he can sustain short-lived, superficial interaction with others in appropriate ways when it is in his perceived interest to do so.

(Administrative Record at 622-23.)

In January 2008, Dr. Ronald C. Myrom, M.D., filled out a pulmonary residual functional capacity questionnaire provided by Carpenter's attorney. On the questionnaire, Dr. Myrom diagnosed Carpenter with COPD, seizure disorder, and chronic back pain. Dr. Myrom noted that Carpenter suffers from severe asthma attacks, and opined that

Carpenter is "disabled from 'asthma.'"[7]  Dr. Myrom further opined that Carpenter "frequently" experiences pain or other symptoms that would interfere with his attention and concentration.  Dr. Myrom found that Carpenter could: (1) walk 1.5 blocks; (2) sit for more than 2 hours at one time; (3) stand for 1 hour at a time; (4) sit and stand/walk less than 2 hours in an eight-hour workday; (5) occasionally lift 10 pounds or less; (6) rarely lift 20 pounds; (7) never lift 50 pounds; (8) rarely twist, stoop, bend, crouch, squat, or climb stairs; and (9) never climb ladders.  Dr. Myrom also determined that Carpenter would need to take several 10 minute unscheduled breaks during a typical eight-hour workday.  Lastly, Dr. Myrom opined that on the average, Carpenter would miss more than four days of work per month due to his impairments.

Additionally, in January 2008, Dr. Myrom wrote a letter to the Social Security Administration regarding Carpenter.  In the letter, Dr. Myrom stated:

> I have under my care Robert Carpenter.  He has chronic obstructive pulmonary disease with a good deal of problems with his breathing.  He also has mental problems.  He has had seizure problems, back trouble, and phosphate disease.  I believe he is disabled on the basis of his mental problems and his emphysema alone.

(Administrative Record at 661.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Carpenter is not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations.  *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003).  The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment

---

[7] *See* Administrative Record at 663.

> meets the criteria of any Social Security Income listings,
> (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the
> impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Carpenter had not engaged in substantial gainful activity since May 4, 2004. At the second step, the ALJ concluded from the medical evidence that Carpenter had the following severe combination of impairments: asthmatic bronchitis, myofascial back pain, cognitive disorder, and psychotic disorder. At the third step, the ALJ found that Carpenter did not have an impairment or combination of impairments listed in 20 C.F.R. § 404, Appendix 1,

16

Subpart P, Regulations No. 4 (the Listing of Impairments). At the fourth step, the ALJ determined Carpenter's RFC as follows:

> [Carpenter] has the residual functional capacity to perform simple, routine[,] repetitive unskilled work of less than light exertion in that he is able to lift and/or carry 20 pounds occasionally, 10 pounds frequently, sit, stand and/or walk for 6 hours in an 8 hour workday, provided such work involves no exposure to temperature extremes, humidity, concentrated dust, fumes, odors, or pulmonary irritants. Such work can involve occasional changes in work routine or processes and occasional contact with coworkers, but no contact with the general public.

(Administrative Record at 15.) Also at the fourth step, the ALJ determined that Carpenter could not perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Carpenter could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Carpenter was not disabled.

### B. Objections Raised By Claimant

Carpenter argues that the ALJ erred in two respects. First, Carpenter argues that the ALJ failed to follow the proper procedure for determining the effect of alcohol abuse in determining whether he was disabled. Second, Carpenter argues that the ALJ failed to properly weigh the opinions of his treating physician, Dr. Myrom.

### 1. Alcohol Abuse

Carpenter argues that the ALJ failed to follow the proper procedure for determining the effect of alcohol abuse in making a disability determination. The procedure for considering alcohol abuse in determining disability is explained in the regulations at 20 C.F.R. § 404.1535 (relating to applications for disability insurance benefits and child's insurance benefits) and 20 C.F.R. § 416.935 (relating to applications for SSI benefits). The two sections are identical and provide as follows:

How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

> (I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 416.935.

According to the regulations, the ALJ must first determine whether the claimant is disabled. *See* 20 C.F.R. § 416.935 ("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug

addiction or alcoholism is a contributing factor material to the determination of disability."
(emphasis added)). "The ALJ must reach this determination initially . . . using the five-step approach described in 20 C.F.R. § 404.150 without segregating out any effects that might be due to substance use disorders." *Brueggemann*, 348 F.3d at 694 (citation omitted). This determination must be based on "substantial evidence of [the claimant's] medical limitations without deductions for the assumed effects of substance use disorders." *Id.*

If the ALJ determines that all of a claimant's limitations, including the effects of substance use disorders, show that the claimant is disabled, then the ALJ "must next consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694-95 (citing *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000); 20 C.F.R. § 404.1535(b)(2)). "The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause." *Pettit*, 218 F.3d at 903 (citations omitted). The claimant carries the burden of proving that alcoholism or drug addiction is not a material factor to the finding of disability. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)). "If the ALJ is unable to determine whether substance abuse disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow. . . . In colloquial terms, on the issue of materiality of alcoholism, a tie goes to [the claimant]." *Brueggemann*, 348 F.3d at 693 (citation omitted). Accordingly, the ALJ is required to develop a full and fair record and support his or her conclusions with substantial evidence. *Id.* at 695. In summary, "[o]nly after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism[,] . . . may [the ALJ] then reach a conclusion on whether [the

claimant's] substance use disorders are a contributing factor material to the determination of disability." *Id*.

Here, the ALJ applied the five-step sequential test and determined that Carpenter was not disabled. At the third-step, the ALJ determined that Carpenter's alcohol abuse, which was in "sustained remission," was not a "severe" impairment.[8] Therefore, the ALJ did not address or perform the analysis provided in 20 C.F.R. §§ 404.1535, 416.935, as to whether alcohol was a contributing factor to the determination of disability. The problem with the ALJ's approach is that she segregated out the effects of Carpenter's alcohol abuse in making her disability determination. *See Brueggemann*, 348 F.3d at 694 ("The ALJ must reach this determination initially . . . using the five-step approach described in 20 C.F.R. § 404.150 without segregating out any effects that might be due to substance use disorders."). In so doing, the ALJ improperly deducted the "assumed effects" of Carpenter's alcohol abuse from his medical limitations. *Id*.

For example, the ALJ disregarded Dr. Harper's diagnosis of mild mental retardation for Carpenter due to Carpenter's alcohol abuse.[9] Specifically, the ALJ found that Dr. Harper's:

> January 2006 testing was performed prior to [Carpenter's] court ordered treatment, a time during which [Carpenter] was drinking heavily. . . . [Dr. Harper] did not note his ongoing alcohol abuse.[10] On the whole, the undersigned finds that the January 2006 test results did not represent [Carpenter's] capabilities. This is particularly so in light of reports from his employers that provide he performed his jobs well when he was not drinking.

---

[8] *See* Administrative Record at 13.

[9] *See Id*. at 400-01.

[10] This is an inaccurate statement by the ALJ. Dr. Harper noted Carpenter's alcohol abuse in his findings. *See* Administrative Record at 401 (In his recommendations, Dr. Harper stated "[s]ubstance abuse treatment is also recommended for [Carpenter] as he is likely to turn to alcohol as soon as he is able.").

(Administrative Record at 13.) The ALJ's finding is in error. The ALJ should not have segregated out Carpenter's alcohol abuse when determining whether Dr. Harper's diagnosis of mild mental retardation constituted a disability. *See Brueggemann*, 348 F.3d at 694. Moreover, had the ALJ considered Dr. Harper's findings and diagnosis of mild mental retardation without segregating out Carpenter's alcohol abuse, it is arguable that Carpenter would have met the requirements of Listing 12.05C which would have resulted in a finding of disability at step-three of the five-step sequential test. According to the regulations, only after making such a finding, should the ALJ then consider a claimant's alcohol abuse and determine whether such abuse is a contributing factor to the claimant's disability. *See Id.* at 695 ("Only after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism[,] . . . may [the ALJ] then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability."). Therefore, the ALJ improperly determined that alcohol was a contributing factor material to the determination of Carpenter's disability without first applying the prerequisite steps outlined in *Brueggemann*. *Id.* Accordingly, the Court finds that remand is necessary for the ALJ to properly consider Carpenter's alcohol abuse as it relates to the entire case, in accordance with the Social Security regulations. *See* 20 C.F.R. §§ 404.1535, 416.935; *Brueggemann*, 348 F.3d at 693-95.

### 2. *Dr. Myrom's Opinions*

Carpenter argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Myrom. Specifically, Carpenter argues that the ALJ's reasons for discounting the doctors' opinions are not supported by substantial evidence on the record. Carpenter maintains that this matter should be reversed and remanded for further consideration of the opinions of Dr. Myrom.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009)

("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In her decision, the ALJ thoroughly addressed and considered the opinions of Dr. Myrom. Specifically, the ALJ determined that:

> The undersigned finds that the opinion of this treating physician is inconsistent with the medical evidence as a whole. First, Dr. Myrom is [Carpenter's] internist. He is not [a] pulmonologist, and orthopedist, or a neurologist. Second, Dr. Myrom provides an opinion in areas beyond his area of expertise. For instance, while his treating records reflect [Carpenter] had advanced emphysema with bronchitis, he noted that despite moderate wheezing he functioned well. In March 2008, his oxygen saturation level was 87 percent and [Carpenter] was noted to be modestly hypoxic, but Dr. Myrom indicated he was 'used to it.' Moreover, Dr. Myrom's opinion statement appears to be based primarily on [Carpenter's] subjective complaints and the fact he only had an 8th grade education. In January 2008, he noted [Carpenter] did not want to work on ladders. For these reasons, Dr. Myrom's opinion is not accorded controlled [sic] weight in reaching the conclusion herein.

(Administrative Record at 20.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Myrom. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Myrom's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings
> and transcript of the record, a judgment affirming, modifying,
> or reversing the decision of the Secretary, with our without
> remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a
> finding of disability and the claimant has demonstrated his [or
> her] disability by medical evidence on the record as a whole,
> we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*,
833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where
"the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of
Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of
denial of benefits is justified where no substantial evidence exists to support a finding that
the claimant is not disabled). In the present case, the Court concludes that the medical
records as a whole do not "overwhelmingly support a finding of disability." *Beeler*,
833 F.2d at 127. Instead, the ALJ failed to follow the proper procedure under the Social
Security regulations, for considering alcohol abuse when making a disability determination.
Accordingly, the Court finds that remand is appropriate.

### VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for
further proceedings. On remand, the ALJ shall follow the procedure set forth in the Social
Security regulations for considering alcohol abuse in determining whether Carpenter is
disabled. *See* 20 C.F.R. §§ 404.1535, 416.935; *Brueggemann*, 348 F.3d at 695 ("Only
after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that
drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what
limitations would remain in the absence of alcoholism[,] . . . may [the ALJ] then reach a
conclusion on whether [the claimant's] substance use disorders are a contributing factor

material to the determination of disability."). Accordingly, the ALJ must reconsider the entire case in accordance with the regulations.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 9th day of August, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA